IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 17-cv-1871-RM-SKC

WENDY KOLBE, and
COLORADO CROSS-DISABILITY COALITION, a Colorado non-profit organization,

     Plaintiffs,

v.

ENDOCRINE SERVICES, P.C., a Colorado Corporation,

     Defendant.

---

## DECLARATION OF KEVIN W. WILLIAMS IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES AND EXPENSES

---

I, Kevin W. Williams, declare as follows:

1.     I am familiar with the facts stated below based on my own personal knowledge, and if it was necessary for me to be called upon as a witness, I could and would testify competently about them.

2.     I am above the age of eighteen years, and, at all times material to this litigation, I have been a resident of the State of Colorado.

3.     My undergraduate degree took a little longer to obtain than I would have liked. It began when I grew up in Ohio and attended Kent State University. After that, I moved to the state of South Carolina and attended the University of South Carolina. During my first semester of my sophomore year there, I sustained a spinal cord injury in 1986. I was fortunate enough to go to Craig Hospital in Englewood, Colorado, a preeminent spinal cord injury rehabilitation

center. After having to travel from South Carolina to Craig Hospital on numerous occasions, I decided to move to Denver, Colorado in 1990. I have lived in the Denver area ever since. I completed my undergraduate studies at the University of Colorado at Denver with a 3.83 grade point average placing me on the Dean's List and receiving a Bachelor of Arts Degree in political science.

4.      I then attended law school at the I graduated in the top of my class from the University of Denver College of Law (now the University of Denver Sturm College of Law) in December of 1996 and received the Order of St. Ives (now the Order of the Coif), an award presented to students who have attained a great ranking in the upper ten percent of all students in their graduating class after all final graduation rankings are released. While attending law school and conducting an independent study, undersigned counsel submitted a law review article that was published and has been cited by several courts and discussed by the Tenth Circuit Court of Appeals. *See* Selected Publications (Exhibit A, my curriculum vitae, submitted with this Declaration). Prior to finishing law school, undersigned counsel arrived at the conclusion that disabilities civil rights law was going to be the career path to pursue.

5.      Since graduating from law school, passing the bar exam and being sworn in to practice in Colorado, I became the Director of the Colorado Cross-Disability Coalition ("CCDC") Civil Rights Legal Program ("CRLP"). I founded the program and, although both my title in the title of the program have changed over the years, I, with the assistance and mentorship of other civil rights attorneys in Colorado, began working as an attorney in that capacity and practicing exclusively in the field of civil rights for people with disabilities since May 15, 1997. I, along with Andrew C. Montoya, am employed by CCDC, a non-profit disability rights

2

advocacy organization. Mr. Montoya and I are the only two attorneys licensed to practice in Colorado who work for the CRLP. We both served as counsel for the Plaintiffs in above-captioned action. Mr. Montoya served as lead counsel, but because there are only two attorneys in the CRLP and one Legal Program Assistant, we all share in the duties on many cases, especially those that must go to trial. The arrangement of the CRLP when Mr. Montoya began working as an attorney was the equivalent to that of a senior partner and an associate because undersigned counsel had thirteen more years of litigation experience as a practicing attorney at that time. Although, as was evident in this case, the roles have become reversed on approximately half of our cases now. Although, we both still collaborate on cases because we both share in the responsibilities of cases like this that go to trial, and as set forth in my curriculum vitae as well as a separate one filed by Mr. Montoya, we both have other duties related to legislative activities and committees we belong to. Mr. Montoya has proven himself to be an extremely capable, competent and (as demonstrated by the case at bar) a persuasive and convincing attorney both in the litigation practice generally and at trial. This was Mr. Montoya's first trial as lead counsel. I cannot express how proud I am of the excellent job he did throughout the course of this case and during the trial, achieving complete victory for the Plaintiffs. He has been entrusted with the majority of the management of many cases. We can do so without having to catch up on every detail of the case before assuming certain duties while the other attorney is tasked with meeting deadlines on other matters. Both attorneys have worked together in this field for many years. Mr. Montoya served as my Legal Program Assistant before going to law school. He even worked for the CRLP while he was in law school. In general, not unlike most law firms, our entire team — two attorneys and our Legal Program Assistant each have a role in every case.

With respect to Kara Gillon, the CRLP hired her in February of 2019 (during the pendency of this case). Ms. Gillon's title is Legal Program Assistant; however, she functions as a legal assistant and paralegal. What is unusual about Ms. Gillon as compared to other assistants the CRLP has hired in the past is that Ms. Gillon herself was a practicing attorney for fourteen years in the field of environmental law and keeps her law license active. She is licensed to practice as an attorney in Washington, D.C. as well as in the Commonwealth of Massachusetts. *See* Declaration of Kara Gillon and her curriculum vitae submitted contemporaneously with this Declaration and the Motion. Ms. Gillon has chosen to work as our Legal Program Assistant, but she brings to the table invaluable experience as an attorney with experience in working for other nonprofit organizations, but that focus on environmental law rather than disability civil rights discrimination law. Although some of the tasks Mr. Montoya and undersigned counsel request of Ms. Gillon are of the type attributed to a legal assistant or paralegal, Ms. Gillon is also an active participant in our case conferences with respect to discussions related to substantive issues involved. She also provides both attorneys with many research memos that, unlike those prepared by assistants and paralegals we have used in the past, demonstrate her skills and abilities and experience as a practicing attorney who has grappled with the sometimes Byzantine regulations and rules under anti-discrimination laws in the disability rights field in the same way an attorney must in order to carefully analyze applicable case law (and related research matters) and provide information to both attorneys that does not require either of us to double check or conduct significant oversight. In other words, as an experienced attorney, Ms. Gillon knows what is needed to answer questions like what constitutes a disability under the civil rights statutes at issue in this case, and how do the prima facie case requirements for claims like those at issue

here interrelate with the regulatory scheme and United States Department of Justice Guidance ("DOJ") established for places of public accommodation with respect to service animals. This remained one of the most complicated issues throughout this case, and Ms. Gillon's experience, training and gifted approach to careful analysis and detail aided greatly in trying to make the issue comprehensible without losing sight of the necessity of ensuring the details related to the differences were accounted for. Ms. Gillon's work on other cases has always produced similar results. During the CRLP case conferences, undersigned counsel requests and relies upon the advice and comments provided by the entire team with respect to substantive areas of law. The entire team includes Ms. Gillon. Even though Mr. Montoya and I rely on Ms. Gillon to address the administrative work necessary to our practice of law, it is my opinion and experience that I am working with two attorneys rather than one attorney and an assistant. We are fortunate to have her as part of the CRLP team based on her past experience as well as her meticulous level of detail. Even though Ms. Gillon has extensive experience as an attorney and holds an active wall license, she has chosen to practice as our Legal Program Assistant. We have billed her rate at $190 Per hour. *See* Declaration of Darold Killmer, an expert retained by CRLP counsel which is being submitted in connection with this Motion ¶ 18 (opining that based on Ms. Gillon's experience and contributions, she should be receiving a higher rate, but noting that there were two other Legal Program Assistants working with the CRLP during the pendency of this case and still finding the rate of $190 per hour reasonable and within the range of what paralegals may recover in the Denver market as well as the fact that counsel have chosen to bill Ms. Gillon's rate lower than Mr. Killmer believes it should be).

6.       CCDC is a 501(c)(3) nonprofit  organization.  As a result, the majority of the

funding for CCDC comes from grants, foundations and private donations. CCDC's purpose is to ensure social justice for people with all kinds of disabilities. To date, there has been very little outside funding for litigation activities like those in which the CRLP is involved. The purpose of starting the CRLP was to ensure that the promises of the ADA and other civil rights laws were being kept and enforced to meet the needs of plaintiffs with disabilities because many could not afford private attorneys, and undersigned counsel was hired to work for CCDC because private attorneys were not taking these cases. The only way the CRLP brings in funding is from prevailing party attorneys' fees with the exception of some consulting and training work. The CRLP seeks to provide access to justice for those with disabilities who otherwise would not have such access. Even though achieving civil rights victories for people with disabilities is the main purpose of the program, funding for the CRLP must come, in large part, from the fee-shifting attorneys' fees provisions of civil rights laws; otherwise there is and will be little to no funding for vindicating the rights of individuals with disabilities. CCDC does not receive any funding from federal or state governmental entities with the singular exception of some of the consulting work that the Executive Director does with the assistance of other non-CRLP staff. Because the CRLP often must bring cases against governmental entities, it would be a conflict for us to except such funding. Often, as demonstrated by the case at bar, the vindication of the civil rights of CRLP clients may be delayed for many years, meaning no funding for a case such as this comes in until the case ends, and the plaintiff or plaintiffs seek their reasonable attorneys' fees, expenses and costs. In this case, we are now approaching five years, although it could be said there was approximately a two year delay that can be attributed to the pandemic, the billing spreadsheet attached hereto as Exhibit B showing all time entries for all timekeepers involved,

6

demonstrates that all three of us were working on this case doing various tasks throughout the entirety of the time this case has been active. Even during that time, the CRLP did prepare for and gear up for trial twice before. Again, this is all reflected in the billing records in Exhibit B. All of the CRLP are salaried staff. In cases such as this one, the time it takes to actually recover attorneys' fees and costs can never be known in advance, and there is the risk of not being the prevailing party. As a result, proceeds from the recovery of attorneys' fees and costs in cases such as this or in those cases the CRLP settles are used to fund the program for the most part. It is not unusual for a small practice like ours that is only one part of a larger nonprofit social justice organization to work on cases in which an entire year or more passes with no fees or costs recovery. In part, because of COVID-19, recent years have only exacerbated this problem because cases have progressed even more slowly than is the norm. Currently, the CRLP had this trial and, depending on rulings on pending motions, will have at least one other trial scheduled this year and perhaps more. We have not had a trial scheduled in many years prior to this. As stated before, however, like most civil cases, the cases the CRLP brings result in settlement more frequently than after a trial. Different statistics undersigned counsel has reviewed over the last 25 years demonstrate that in disability civil rights cases for practitioners who do the type of work the CRLP does, the number of settlements is higher. Because the CRLP attorneys are experts in this area of law, the attorneys do not bring lawsuits without having a command of the law and facts in advance. We have believed since the beginning of the case at bar, this is exactly the type of case in which the law clearly weighed heavily in our favor especially based on the chosen defense theory. Undersigned counsel is not suggesting that the CRLP is always right, but because of our in-depth knowledge of the law, and because we present it at length to those against whom

we send demand letters or file lawsuits against, it would seem that in most of our cases, the law is clear, and the defendant or counsel for the defendant should recognize that even if they did not do so before. The law is complicated in many ways. For example, proving the multiple elements of the definition of disability, (1) a physical or mental impairment, (2) that substantially limits (3) a major life activity, as the starting point, followed by lengthy descriptions about what each of those different parts means) is quite different from other types of discrimination against individuals on the basis of race, gender or other typical categories of individuals covered by anti-discrimination laws; also, what constitutes discrimination is very different as well. For example, it is very often true that the only way to provide an individual with a disability with equal opportunity is to treat the individual with the disability differently from everyone else. The concepts of reasonable accommodation and the need for the reasonable modification of policies, practices and procedures as in this case demonstrate how this is so. A simple example is the accessible parking space. For a person like undersigned counsel who drives a van with a side-loading wheelchair ramp, if undersigned counsel's office complex provided a parking space identical to the ones it provides to nondisabled office tenants, undersigned counsel would not be able to park there. A van transporting or being driven by an individual who requires the use of a motorized wheelchair as I do needs and eight feet wide access aisle in order to be able to use and enjoy parking on an equal basis with nondisabled individuals.

7.      The CRLP has collaborated with counsel who work in this field and cases as well, but there are not that many in Colorado. In the early days of my practice, we collaborated extensively with the law firm of Fox and Robertson, P.C., (the principals, Tim Fox—law school graduate of Stanford University—and Amy Robertson—law school graduate of Yale Law—both

8

at the top of their respective law school graduating classes and met as associates for a very large law firm in Washington D.C., then known as Wilmer, Cutler and Pickering (now Wilmer Cutler Pickering & Hale, L.L.C.) before deciding to move to Denver, Tim Fox's hometown, who had just started their own civil rights law firm focusing mostly on disability civil rights discrimination cases many times on both statewide and nationwide disability civil rights class action cases,[1] and we have collaborated with two similar nonprofit organizations that work in this field, Disability Law Colorado in the Civil Rights Education and Enforcement Center. That was and, for the most part, is the totality of attorneys who practice exclusively in the field of disability rights with the exception of one nonprofit DisabilityAdvocacy with one attorney who practices exclusively in the area of Special Education Law (a very specialized field involving the Individuals with Disabilities Education Act and Section 504). Some private law firms that take on employment cases another specialized areas. There are now more private attorneys in Colorado taking on these types of cases, but still because of the risks involved in the time it takes to recover fees, this area practice is left largely to administrative agencies that cannot possibly cover all of the cases necessary. Even though disability civil rights laws have been on the books for many years, there are still too many violations to resolve. In addition, unfortunately, lately, there have been attorneys from outside of the state who appear to be bringing multiple lawsuits in this United States District Court without actually seeking justice for people with disabilities and may have other motives.[2] The CRLP also has worked with the United States Department of

---

[1] A listing of some of the statewide and nationwide class-action cases in which the undersigned and the CRLP have collaborated are included on Exhibit A attached hereto.

[2] Incidentally, that is not how the CRLP has worked under my watch, and CCDC would not tolerate it. The CRLP and CCDC have made numerous public comments and statements regarding this issue. CCDC and the CRLP are about making change, not money, and expression often used to indicate the fact that injunctive relief, monitoring of lawsuits to ensure compliance and ensuring that the actual purposes of the ADA and other civil-rights laws for people with disabilities are carried out has always been far more important than large damages verdicts. Nevertheless, we must

Justice ("DOJ"), Civil Rights Division, Disability Rights Section as well as local United States Attorneys assigned to Colorado civil rights cases in collaboration on cases in the past. The DOJ has substantial enforcement powers that are different from those available to a private attorneys. They have also been of great assistance to us in preparing statements of interest and amicus briefs. My curriculum vitae sets forth the many ways in which I and the CRLP stay engaged with our activities, other disability rights law firms and nonprofit organizations throughout the country as well as several committees on which I serve as a member addressing similar issues.

8.     In the nearly twenty-six years the CRLP has been in existence, it has resolved hundreds of cases enforcing the rights of people with disabilities. The vast majority of these cases resulted in settlements, but I have served as lead counsel in several trials, second chair with attorneys outside of the CRLP in other trials and as second chair to Mr. Montoya in this case at trial. Nevertheless, even though those cases that are not resolved in settlement have often been resolved on motions for summary judgment filed by the CRLP on behalf of plaintiffs, which is not typical for plaintiffs' counsel. It has been the experience of undersigned counsel that motions for summary judgment filed by either side often are not successful, but is even rarer when counsel for plaintiffs is successful on such a motion. I have participated in and served as lead counsel in many oral arguments over motions on summary judgment, motions to dismiss and other arguments before the United States District Court for the District of Colorado and the Tenth Circuit Court of Appeals. I have also tried cases and argued cases in state District Court in

---

recover our reasonable attorneys' fees and costs in order for CCDC to keep the CRLP operating. Often, a meaningful award of reasonable attorneys' fees and costs shows recalcitrant defendants and others who might decide to wait until they are subjected to a lawsuit before making changes as required under these laws before complying with the ADA that they made a mistake in not insuring appropriate and equal access for people with disabilities as these laws have required for many years.

Colorado. Even though actual trials do not occur frequently in our line of work, that does not mean that we have not engaged in extensive briefing in many cases and resolved many others on the proverbial courthouse steps. I have also argued before both state and federal courts on motions for attorneys' fees. Selected cases appear on my CV.

9.      The CRLP also engages in training, consulting, teaching and other speaking engagements related to the many topics involved in the enforcement of the civil rights statutes protecting the rights of people with disabilities. These also are reflected in Exhibit A and in the similar Exhibit to the Declaration of Andrew Montoya. Because we work for CCDC, an organization with a mission and purpose that include educating our membership as well as the general public about social justice issues for people with disabilities, I and Mr. Montoya are routinely asked to speak at numerous functions, bar activities, for individuals with disabilities, other disability rights organizations, and more, related to our expertise in this area. Because CCDC is a membership organization and its mission and purpose involve educating the membership and general public regarding the activities of the organization, including the activities of the CRLP, the CRLP has had an ongoing relationship with media outlets interested in covering our stories. The vast majority of stories undersigned counsel sees regularly recently involve all the reasons why people should consider disability rights statutes to be a bad thing. Generally, our results are beneficial for people with disabilities, and CCDC wants us to get the word out. As has often been said in the organization and by undersigned counsel, "laws are just pieces of paper; they must be enforced." Also, only the lawyers really know the ins and outs of what has transpired in any given case and the appropriate way to convey that to the media after obtaining client consent. As a result, our Executive Director would requests and agrees with Mr.

11

Montoya and I that we should be the contact persons when inquiries are made as a result of
beneficial activities of the CRLP. All entries with respect to media outreach have been reduced
as non-billable.

10.     The current rates the CRLP bills for the attorneys and assistant in this case are
the following: Kevin Williams (J.D. 1996) $505; Andrew Montoya (J.D. 2010) $425; Kara
Gillon (J.D. 1997 -- not currently licensed to practice in Colorado, but licensed into other
jurisdictions with fourteen years of attorney experience) $190. Mr. Montoya and Ms. Gillon each
provided separate Declarations with their respective curricula vitae attached. At the beginning of
this case, prior to Ms. Gillon joining the CRLP, the CRLP had two different Legal Program
Assistants, Tram Ha. Ms. Ha have a Bachelors Degree when she joined CCDC. Ms. Ha left
CCDC after being accepted into law school in 2018. Ms. Ha performed preliminary legal
assistant work on this case, but, with those exceptions that appear, we have left out time entries
we do not have for her time at the beginning of the case; Ms. Ha was replaced by Gabrielle
Angelico who had a Master's degree when she joined us. She also left for other employment in
2019 (those listed as LPA prior to Ms. Gillon joining in February 2019).

11.     I am familiar with decisions by judges in the United States District Court for the
District of Colorado, the Tenth Circuit Court of Appeals and the United States Supreme Court
regarding the reasonableness of rates and fees because the CRLP has been required to submit
motions like the one now in many cases over the years. Because we only recover reasonable fees
and expenses if we are the prevailing party, the only way the CRLP continues to operate is
through the recovery of such fees and expenses. *See, e.g,, Ramos v. Lamm*, 713 F.2d 546, 555
(10th Cir. 1983) (a key case and analyzing the factors applicable to lodestar analysis in civil

rights cases), *rev'd in part on other grounds*, *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987); *Vanech v. Acosta*, 13-CV-00168-RPM, 2019 WL 3938065, at *3 (D. Colo. Apr. 9, 2019); *Roane v. Frankie's Bar & Grill*, 16-CV-02936-CMA-NYW, 2018 WL 4076287, at *5 (D. Colo. Aug. 27, 2018); *Ryals v. City of Englewood*, 12-CV-02178-RBJ, 2014 WL 2566288, at *9 (D. Colo. June 6, 2014).

12.     In determining an appropriate rate, factors to be considered include as set forth in the paragraph above is counsel's "skill and experience in civil rights or analogous litigation." As a result, and commensurate with increased skill and experience, it is the standard practice of the CRLP to increase rates by ten dollars per year.

13.     Undersigned counsel has been a member of the Colorado Bar Association since the beginning of law practice and keeps apprised of trends occurring in the Colorado Bar Association Economics of Law Practice Surveys. Usually, the CRLP uses these when seeking recovery of fees and expenses and for determination of reasonable and appropriate rates in motions such as this; however, because the most recent survey was published in 2017 from results obtained in 2016, those results are now nearly six years old and not as useful as trends found in more recent court decisions. Also as set forth in the Declaration of Darold Killmer, the 2012 survey results are far more reliable. The results of this latest survey is available online. http://www.cobar.org/portals/COBAR/repository/2017EconomicSurvey.pdf (last viewed April 18, 2022). It also is not particularly helpful in shedding light on the exact types of cases the CRLP brings. As said, because (1) the CRLP represents clients with disabilities who more often than not cannot afford to hire an attorney at an hourly rate, (2) the CRLP takes on a risk with every case filed that the plaintiffs involved may not be the prevailing parties entitled to recovery

of reasonable fees and litigation expenses, (3) the CRLP works exclusively in the specialized

field of disability civil rights law, the survey results do not provide direct analogs to the type of

work undertaken in this and our other cases. Undersigned counsel is familiar with case law

stating language comparable to the following:

> [Fee-shifting civil rights statutes  contemplate[] that both public interest lawyers and private law firms be provided with incentive to prosecute civil rights actions; the fee awards provide this incentive by increasing the ability and willingness of both groups to finance litigation they would otherwise be unable or unwilling to afford. To pay public interest firms less than private firms could frustrate the prosecution of civil rights litigation. Potential liability for full value fee awards can deter violations of the civil rights laws, especially in situations in which the fee award represents a significant portion of a defendant's financial exposure. Establishing a lower fee when public interest lawyers represent plaintiffs will reduce the incentive to eliminate violations, and will provide defendants with less incentive to settle and more incentive to engage in dilatory tactics than would be present if private firm lawyers were involved.

*Ramos*, at 552 (emphasis added). Language such as this indicates that using survey results

would be helpful to demonstrate what the prevailing market rates are for attorneys who do

bill clients and an hourly rate, but there simply is not a close analog in the 2017 survey

results that sheds much light on the work the CRLP does.

14.     Undersigned counsel took responsibility for reviewing the billing records

line by line submitted in connection with this Motion and exercising reasonable billing

judgment to remove time devoted to this case from the final amount Plaintiff requests from

this Court as recommended by the United States Supreme Court in *Hensley v. Eckerhart,*

461 U.S. 424, 437 (1983) and followed by this Court. S*ee, e.g.*, *HICA Educ. Loan Corp. v.*

*McKinney*, 12-CV-00218-RM-KLM, 2015 WL 1038984, at *2 (D. Colo., Mar. 6, 2015). In

addition, as is common practice throughout this district, final rates billed were adjusted to

reflect rates in effect at the time the fee is being established by the court, rather than those in

effect at the time the services were performed. *See, e.g.*, *Ramos*, 713 F.2d at 555.

15. Because fee-shifting cases are the bulk of undersigned counsel's work, everyone in the LP is familiar with timekeeping requirements. Undersigned counsel is familiar with the applicable case law. The staff kept "'meticulous, contemporaneous time records that reveal, for each lawyer [and assistant] for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks.'" *Ctr. for Biological Diversity*, 703 F. Supp. 2d at 1247 (quoting *Case v. Unified Sch. Dist.*, 157 F.3d 1243, 1250 (10th Cir. 1998)); see also *Madrid v. Stellar Recovery, Inc.*, No. 15-CV-02553-MSK-NYW, 2016 WL 3220977, at *2 (D. Colo., June 3, 2016) (same); *See also* Montoya Decl. ¶ 22 (describing time-keeping practices and tasks performed). That is the way the CRLP keeps track of time. We do our best to enter time contemporaneously or as soon as possible after the task has been performed.

18. Undersigned counsel's billing rate of $505.00 per hour is based on the following factors: (1) as of May 15, 2022, undersigned counsel will have twenty-six years of specialized expertise in the field of civil rights cases for people with disabilities; and (2) the Colorado Bar Association 2012 Economic Survey Snapshot ("Survey") Killmer Decl. ¶ 20 and n.4.

19. Also, all rates have been adjusted for each timekeeper to the current rate charged given me amount of time it has taken to complete this case. This is typical in this jurisdiction. Killmer Decl. ¶ 20.

20. Him A true and correct copy of the Billing Records of each timekeeper assigned to this case is attached hereto as Exhibit A.

21. Undersigned counsel reviewed the billing statement prepared by all timekeepers, and then compiled, updated and finalized by our Legal Program Assistant. Undersigned counsel exercised reasonable billing judgment. For reasons related to the types of

15

time that entries that been denied by courts in motions and existing case law, for example, time spent talking with media by the attorneys, the reduced billing time is reflected in the billing records submitted. There is an argument to be made that because CCDC was a plaintiff in this case and providing education and information about successes in cases such as this one to our membership and the general public is part of the mission and purpose of the organization (and only the attorneys have the ability to discuss the law and details of the case after obtaining consent from clients), this time could be compensable, but it has been reduced to $0.00. In many instances where it appeared that undersigned counsel or any timekeeper may have billed for more time than would be expected (undersigned counsel uses a vast array of different technologies to accomplish tasks like preparing briefs such as this, and sometimes these take longer than if the task was performed by someone else), undersigned counsel reduced that time. I also reduced time spent on purely administrative tasks regardless of who performed them. These also have been reduced to $0.00. I the entries for Mr. Montoya and Ms. Gillon and found them to be within the realm of reasonableness based on past motions for fees and expenses we have had to submit, rulings on those motions, the Survey referenced above and recent decisions of this district court. In the vast majority of instances, undersigned counsel removed billing entries during which both counsel conferred with each other and left the entry for which Mr. Montoya or I had billed a lower amount. I reduce the time for the collaboration to the lower time entry listed for each of the timekeepers. Reductions made to the time entries listed under the column entitled "Amount" were reduced by me as set forth in the column entitled "Billed Amount." All of the aforementioned actions were taken in the exercise of reasonable billing judgment. Undersigned counsel also reviewed expenses and the separate Bill of Costs to ensure that such any litigation

expenses were of the type permitted by decisions and rules governing expenses and costs in this jurisdiction.

22.      Our billing rates with the adjustment of ten dollars per year as an increase can be justified by rates obtained in past cases that resulted in the necessity of filing a motion for fees. *See, e.g.,* In a 2016 case similar to the case at bar, the Senior District Court Judge Richard P. Matsch for the District Court of Colorado awarded the LP the rates it sought: *Longdo v. Pelle*, 15-CV-01370-RPM, 2016 WL 10591328, at *5 (D. Colo. Sept. 8, 2016) ("hourly rates of $450 for Mr. Williams; $370 for Mr. Montoya . . . are reasonable."). The prior Legal Program Assistants' billing rates are $190 per hour which is consistent with the Snapshot to the Colorado Bar Association Economic Survey conducted in 2012 and provided with the Declaration of Darold Killmer in support of this Motion. *See also Longdo*, 2016 WL 10591328, at *5 (finding that $150 per hour was a reasonable rate for time spent by legal assistants ten years ago).

> Competent representation in civil rights cases requires significant skill, can consume considerable resources, and entails significant risk for the attorneys who undertake them. They often involve relatively small monetary recoveries even when, as in this case, they seek and accomplish significant non-monetary relief for not only the named plaintiff but also other similarly-situated members of the public. Reasonable hourly rates reflect that reality. Based on the opinions and data provided [including an expert report from Darold Killmer, the same expert used in the case at bar], as well as the Court's own knowledge and experience with respect to rates charged by attorneys with comparable experience and expertise in this area of litigation in the Denver, Colorado area, the Court finds that the rates sought . . . are reasonable.

*Longdo*, at *5 (D. Colo. Sept. 8, 2016). *See also Jordan v. Shrader,* 18-cv-01225-MSK-NYW, 2020 WL 6392435, at *1 (D. Colo. Nov. 1, 2020) with respect to rates adjusted each year in ten dollar per year increments. Although the defendant did not challenge rates for undersigned counsel of $475 per hour and Mr. Montoya at a rate of $395 per hour, Judge Krieger awarded did not object to the

rates; Judge Krieger also awarded Ms. Gillon a rate of $160 per hour.[3] Those were the rates the CRLP billed at the time the motion was filed on September 25, 2019 (Doc. No. 73 in that case). Also, unlike the case at bar in which Plaintiff's received all requested relief after a trial, that case was the result of a settlement in which attorneys' fees and costs were part of the negotiation and Offer of Judgment. It did not involve going all the way through a jury trial. Based on undersigned counsel's experience, receiving all relief requested, or what is commonly referred to as an "excellent result" should allow Plaintiff's full recovery for the fees sought. "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee." *Jane L. v. Bangerter*, 61 F.3d 1505, 1511 (10th Cir. 1995) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). "[I]ndeed in some cases of exceptional success an enhanced award may be justified." *Id*.

23.     Not only are Plaintiffs not seeking an enhanced award, but they are also not seeking the time spent preparing this Motion. All three timekeepers spent an enormous amount of time preparing this Motion, researching and updating relevant case law, communicating with the expert, etc. Nevertheless, we have chosen not to seek additional fees for this time. Although Plaintiffs are entitled to recover for the time spent seeking the recovery of attorneys' fees, in the exercise of reasonable billing judgment, undersigned counsel has made the decision to cut off the billing that

---

[3] Plaintiff did seek a higher rate for Ms. Gillon in that motion because of her fourteen years of experience as a practicing attorney prior to deciding to work for CCDC's CRLP as a Legal Program Assistant, but the Court determined, "The Court agrees with Denver that the tasks performed by Ms. Gillon typically involved routine clerical matters such as proofreading and cite-checking, scheduling and calendaring, and other tasks that did not draw meaningfully upon her legal training." *Id*. Although for the reasons set forth in this Declaration and the Declarations of Andrew C. Montoya and Kara Gillon, Plaintiffs' counsel in this case disagree that many of the tasks involved in the case of our were "routine clerical matters," because, as said, both Mr. Montoya and I work with Ms. Gillon collaboratively on cases and requests that she provide extensive legal research and memos for counsel as well as substantive comments regarding documents filed with courts in all cases since she began working with us, Plaintiffs' counsel will not seek a higher rate with the exception of the addition of ten dollars per hour from the rates charged in 2019 until now based on this previous case. Some of the tasks set forth in the attached billing statement may not have drawn upon her legal training, a great deal of her work does, in fact, draw on such experience. Nevertheless, in the interest of being consistent with past rulings from this District, Plaintiffs seek $190 per hour for Ms. Gillon's work on this case.

was necessary for this case at March 31, 2022, and not include all time spent in the month of April 2022 addressing this Motion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April, 2022.

_s/ Kevin W. Williams_____
Kevin W. Williams